IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
February 3, 2021 Session

## ESTATE OF SEDLEY ALLEY v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Shelby County**
**Nos. 85-05085, 85-05086 & 85-05087     Paula L. Skahan, Judge**

_____

### No. W2019-02046-CCA-R3-PC

_____

The Appellant, the Estate of Sedley Alley ("the Estate"), appeals from the Shelby County Criminal Court's dismissal of its petition for post-conviction DNA analysis. The 2019 petition sought DNA testing of items from the Defendant's trial despite the fact that the Defendant, who had received the death penalty, was executed in 2006. The Estate argued that the Post-Conviction DNA Analysis Act ("the DNA Act") permitted the Estate to petition for DNA testing because the civil right of survivorship statute applied. The Estate additionally argued that United States and Tennessee Constitutions require that the Estate be allowed to petition for DNA testing under the DNA Act, citing to principles of due process and a "reputational guarantee." Following our review of the applicable authorities, we hold that the Estate is not a "person" within the purview of the DNA Act and that neither due process nor any reputational guarantee require a remedy under these facts. Accordingly, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which CAMILLE R. MCMULLEN and J. ROSS DYER, JJ., joined.

Stephen Ross Johnson, Knoxville, Tennessee; Josie S. Holland and William D. Massey, Memphis, Tennessee; Andra J. Hedrick, Nashville, Tennessee; Paul D. Clement, George W. Hicks, Jr., Megan M. Wold, and Sara S. Tatum, Washington, D.C.; and Barry C. Scheck and Vanessa Potkin, Innocence Project, New York, New York, for the appellant, Estate of Sedley of Alley.

Herbert H. Slatery III, Attorney General and Reporter; Andrée Sophia Blumstein; Solicitor General; Andrew C. Coulam, Senior Assistant Attorney General; Amy P. Weirich, District Attorney General; and Stephen P. Jones, Assistant District Attorney General, for the appellee, State of Tennessee.

# OPINION
## FACTUAL BACKGROUND

In July 1985, nineteen-year-old Marine Lance Corporal Suzanne Collins' life was ended after being beaten, raped, and impaled with a thirty-one-inch long tree branch. See State v. Alley, 776 S.W.2d 506, 508-09 (Tenn. 1989), cert. denied, 483 U.S. 1036 (1990). Thereafter, a Shelby County grand jury charged the Defendant as the assailant.

At trial, the State produced evidence establishing the following facts. The almost thirty-year-old Defendant, Sedley Alley, was a civilian married to a member of the military, and they lived on the Millington Naval Base in Millington, Tennessee. Alley, 776 S.W.2d at 508. The victim lived on the same base. Id. During the late evening hours of July 11, 1985, the Defendant abducted the victim while she was jogging on the base. Id. Two marines jogging near where the victim was abducted heard the victim scream and ran toward the sound. Id. at 509. However, before they reached the scene, they saw the Defendant's car drive off. Id. They reported to base security and accompanied officers on a tour of the base, unsuccessfully looking for the car they had seen; they returned to their barracks. Id. Soon after returning to their quarters, however, the marines were called back to the security office, where they identified the Defendant's car, which had been stopped by officers. Id. The Defendant and his wife gave statements to the base security personnel accounting for their whereabouts. Id. The security personnel were satisfied with the Defendant's story, and the Defendant and his wife returned to their on-base housing. Id. A few hours later the next morning on July 12, 1985, the victim's body was found in a nearby park. Id. at 508. The Defendant was immediately arrested by military police. Id. at 509. He gave a "lengthy statement of his activities that resulted in the death of Suzanne Collins to officers of the Naval Investigating Service on the morning of 12 July 1985." Id. at 508. After completing the statement, the Defendant voluntarily accompanied officers "over the route he had taken the night before and to the location of the murder and accurately identified various things, including the tree where he had left the body and where it was found by others and from which the limb he used had been broken." Id. at 509.

The Defendant relied upon an insanity defense at trial. Alley, 776 S.W.2d at 510. The Defendant presented the testimony of two psychologists who diagnosed the Defendant as suffering from a multiple personality disorder. Id. However, neither doctor could verify whether an alternate personality was in control at the time of the offense. Id. The State's psychologist also examined the Defendant and determined that psychological tests administered to the Defendant in May 1986 suggested that he was exaggerating or malingering. Id. at 510-11. The State's psychologist further noted that Defendant had no history of mental health treatment prior to the murder and that it was "improbable that a condition of insanity had taken control of his actions on the evening of the murder." Id. at 511. In sum, the State's psychologist, while diagnosing a borderline personality disorder

with a chronic history of drug and alcohol abuse, found no evidence of multiple personality disorder or psychosis. Id.

A Shelby County jury rejected the Defendant's insanity defense and found the Defendant guilty of the kidnapping, aggravated rape, and premeditated first-degree murder of the victim. Alley, 776 S.W.2d at 508. In addition, the jury found two aggravating circumstances, i.e., the murder was especially heinous, atrocious, or cruel, and the murder was committed during a kidnapping and rape, and sentenced the Defendant to death. Id. "He was sentenced to [forty] years on each of the other offenses, all sentences consecutive." Id.

This case was the subject of extensive appellate review prior to the Defendant's June 28, 2006 execution.[1] After the guilty verdict, the Defendant's convictions and sentences were affirmed on direct appeal. Alley, 776 S.W.2d at 519. Thereafter, the Defendant sought post-conviction relief, which was denied by the trial court. See Alley v. State, 882 S.W.2d 810, 813 (Tenn. Crim. App. 1994). On appeal, this court reversed the trial court's denial, ordered the recusal of the trial judge, and remanded the case for a new hearing. Id. at 818-23. Upon remand, the Defendant was again denied relief. See Alley v. State, 958 S.W.2d 138, 141 (Tenn. Crim. App. 1997), perm. app. denied (Tenn. Sept. 29, 1997). This time on appeal, this court affirmed the trial court's denial of post-conviction relief. Id. at 156. In 1998, the Defendant filed a petition for writ of habeas corpus in the United States District Court for the Western District of Tennessee. The district court denied the petition. See Alley v. Bell, 101 F. Supp. 2d 588, 601-73 (W.D. Tenn. 2000). The Sixth Circuit affirmed the district court's denial of relief. See Alley v. Bell, 307 F.3d 380, 384 (6th Cir. 2002), cert. denied, 540 U.S. 839 (2003), reh'g denied, 540 U.S. 1086 (2003).

Relative to the Defendant's previous requests for DNA testing, on May 4, 2004, which was a month before his scheduled execution date at the time, the Defendant filed a petition in the Shelby County Criminal Court seeking DNA analysis pursuant to the DNA Act. See Sedley Alley v. State, No. W2004-01204-CCA-R3-PD, 2004 WL 1196095, at *1 (Tenn. Crim. App. May 26, 2004), perm. app. denied (Tenn. Oct. 4, 2004), cert. denied, 544 U.S. 950 (2005) ("Alley I"); see also Tenn. Code Ann. §§ 40-30-304, -305. In his petition, the Defendant requested the production of eleven biological samples for DNA testing: (1) vaginal swabs from the victim; (2) a swab taken from the victim's right inner thigh; (3) a swab taken from the victim's left inner thigh; (4) nasopharyngeal swabs from the victim; (5) oral swabs from the victim; (6) rectal swabs from the victim; (7) head hairs from an African-American individual found on the victim's socks; (8) a Caucasian body hair found on the victim's waistband; (9) a Caucasian pubic hair found on the victim's left

---

[1] For the sake of brevity, we do not provide in this opinion an exhaustive list of all the Defendant's filings and appeals. We will only cite to those we deem relevant here.

shoe; (10) a hair on a stick found in the victim; and (11) the victim's blood and hair samples. Id. at *3.

The Defendant argued that the samples contained biological evidence that would have established the identity of the person or persons who committed the sexual assault and murder of the victim. Alley I, 2004 WL 1196095, at *3. In essence, the Defendant asserted that he was not the perpetrator of these offenses despite his prior confession. Id. He contended that "certain evidence tend[ed] to implicate one of the victim's romantic partners." Id. Additionally, the Defendant maintained that certain trial evidence should be disregarded as unreliable because (1) the Defendant's confession was coerced; (2) recently discovered documents from the medical examiner revealed that the victim's time of death was later than originally thought; (3) the description of the perpetrator provided by a witness did not match the Defendant's description; (4) the description of the vehicle provided by witnesses did not match that of the Defendant's vehicle; (5) tire tracks at the abduction scene did not match the Defendant's vehicle; (6) fingerprints on a beer bottle recovered near the victim's body were not identical to the Defendant's; and (7) shoe prints at the abduction scene did not match the shoes the Defendant was wearing on the night in question. Id.

Following a hearing, the trial court, on May 17, 2004, denied the Defendant's petition for DNA testing, finding that the Defendant had "failed to demonstrate that a reasonable probability exist[ed] that . . . he would not have been prosecuted or convicted if exculpatory results had been obtained through DNA analysis of the requested samples." Alley I, 2004 WL 1196095, at *1. The trial court further found that the Defendant had "failed to demonstrate that a reasonable probability exist[ed] that analysis of said evidence w[ould have] produce[d] DNA results which would have rendered the [Defendant's] verdict or sentence more favorable if the results had been available at the proceeding leading to the judgment of conviction." Id.

On appeal of the 2004 post-conviction DNA proceeding, this court noted the following additional testimony that was presented at the Defendant's trial that was germane to the issue of DNA testing. Dr. Craig Lahren, an expert in hair analysis, and Paulette Sutton,[2] an expert in forensic serology, testified at the Defendant's trial. Alley I, 2004 WL 1196095, at *6. Dr. Lahren examined a hair collected from inside the victim's shoe and determined this hair to be a "Caucasian pubic hair." Id. He stated that "[t]here was nothing unusual or unique about the item, and the sample was too limited to actually do a fair comparison with the . . . known pubic hair." Id. A hair found on the victim's waistband was examined and determined to be a "medium-brown Caucasian body hair, probably from the arm or the leg." Id. Again, there was not "enough consistent microscopic

---

[2] Though this witness's last name was spelled Sims in this court's 2004 opinion, subsequent opinions indicate that the correct spelling is Sutton.

- 4 -

characteristics" to "do a successful comparison on those." Id. Two strands of hair collected from the victim's socks were identified as being from an African-American. Id. Dr. Lahren testified that the presence of these hairs on the victim's socks would be consistent with the victim's walking around in her "sock feet." Id. Four hairs found on the victim's shirt were "light-brown Caucasian head hair," ranging from two to seven inches in length; these hairs were determined to belong to the victim. Id. Finally, hair found on the driver's side of the Defendant's 1972 Mercury station wagon "appeared to be the same as [the victim's] head hair." Id.

Paulette Sutton examined blood specimens found at the crime scene. Alley I, 2004 WL 1196095, at *7. Blood was found on the driver's side door and near the headlight of the Defendant's vehicle. Id. The blood found on the driver's side door revealed "ABO" type blood, the same type as the victim. Id. The stain was found to be consistent with bloody hair's having been swiped across the surface just above the door handle going downward toward the road. Id. Ms. Sutton also examined a bloody napkin found on the floorboard of Defendant's car, but she was not able to determine the species origin for the sample. Id. Similarly, there was blood on a screwdriver found at the scene, but Ms. Sutton could not identify the source. Id. There were no blood or seminal stains found on the victim's clothing. Id. Blood was found on the Defendant's shorts, but a blood type could not be determined. Id.

This court affirmed the trial court's denial of the DNA petition. Alley I, 2004 WL 1196095, at *13. In rendering its decision to affirm, this court initially remarked,

> The purpose of the [DNA] Act is to establish the innocence of the [Defendant] and not to create conjecture or speculation that the act may have possibly been perpetrated by a phantom defendant. Where the allegation is of recent origin and the evidence otherwise supports the identity of the [Defendant] as the perpetrator, a prior confession may be sufficient to deny DNA testing.

Id. at *9. After stating this principle, this court indicated that it would proceed to review the evidence in light of the possible results of DNA testing. Id. However, before doing so, this court added,

> [T]he [DNA] Act only permits "the performance of a DNA analysis which compares the [Defendant's] DNA samples to DNA samples taken from biological specimens gathered at the time of the offense." See Earl David Crawford v. State, No. E2002-02334-CCA-R3-PC, 2003 WL 21782328, at *3 (Tenn. Crim. App. Aug. 4, 2003), perm. app. denied (Tenn. Dec. 22,

2003). Thus, the [DNA] Act does not permit DNA analysis to be performed upon a third party. Rather, the results of the DNA testing must stand alone.

Id. at *10.

This court then engaged in analysis of the eleven biological samples the Defendant desired to test and detailed the trial evidence used to convict the Defendant. Alley I, 2004 WL 1196095, at *10-12. Ultimately, this court determined that even if any of the samples of which the Defendant sought testing revealed the presence of a third-party's DNA, the Defendant had still failed

> to establish that (1) a reasonable probability exist[ed] that the [Defendant] would not have been prosecuted or convicted if exculpatory results had been obtained through DNA analysis and (2) a reasonable probability exist[ed] that analysis of the evidence w[ould have] produce[d] DNA results which would have rendered the [Defendant's] verdict or sentence more favorable if the results had been available at the proceedings leading to the judgment of conviction.

Id. at *13 (citing Tenn. Code Ann. §§ 40-30-304(1), -305(1)).

With his execution postponed, the Defendant filed an action under 42 United States Code Annotated section 1983 in the United States District Court for the Western District of Tennessee requesting injunctive relief in the form of access to certain evidence[3] introduced in his criminal trial for purposes of DNA testing. See Alley v. Key, 431 F. Supp. 2d 790, 793 (W.D. Tenn. 2006). He claimed that his Eighth, Ninth, and Fourteenth Amendment rights had been violated because he was not allowed to obtain DNA testing of the physical evidence taken from the crime scene. Id. Relative to his due process allegations, he incorporated a procedural due process claim, a substantive due process claim, and a due process right to the production of exculpatory evidence. Id. 800-03. Ultimately, the district court dismissed the Defendant's petition for failing to state a claim upon which relief could be granted. Id. at 804.

Specifically, regarding procedural due process, the Defendant argued that his right to procedural due process under the Fourteenth Amendment required release of the requested evidence and that because he possessed a fundamental interest in his life, due process required that he be allowed access to evidence that might have allowed him to

---

[3] In the Sixth Circuit's subsequent opinion, it was noted that the Defendant sought DNA testing of a stick found inside the victim's body, the victim's underwear found at the scene, another set of purportedly men's underwear also found at the scene, and the victim's shorts, bra, shirt, shoes, and a sock. See Sedley Alley v. William R. Key, No. 06-5552, 2006 WL 1313364, at *1 (6th Cir. May 14, 2006), reh'g en banc denied (6th Cir. May 16, 2006), cert. denied, 548 U.S. 921 (2006).

preserve that life interest by demonstrating his innocence of the crime for which he was sentenced. Alley, 431 F. Supp. 2d at 800. Rejecting the Defendant's procedural due process allegation, the district court reasoned that the Defendant had no state law right to release of the evidence and that "no court of binding or persuasive authority ha[d] concluded that federal law encompasse[d] such a right." Id. at 801. Thus, because the Defendant could not articulate any established legal right to access the evidence, he was not entitled to due process before being deprived of the evidence. Id.

Relative to substantive due process, the Defendant argued: (1) it "shock[ed] the conscience" to withhold the evidence arbitrarily in this matter; and (2) the Defendant's life interest included the right to obtain evidence of his innocence for presentation in clemency proceedings. Alley, 431 F. Supp. 2d at 801. The district court also found this claim to be without merit. The district court first determined that "[b]ecause there [was] no demonstrable state or federal entitlement to post-conviction release of the evidence on demand, [the court clerk's] refusal to do so [could] not 'shock the conscience[,]'" and second, that there was "no substantive due process right of access to evidence to present claims in executive clemency proceedings or otherwise[.]" Id. at 801-02.

Finally, the Defendant contended that due process required that the requested evidence be released to him because of his right to the disclosure of exculpatory evidence, citing Brady v. Maryland, 373 U.S. 83 (1963). Alley, 431 F. Supp. 2d at 802. Once again, the district court found the Defendant's due process claim to be without merit. Id. at 802-03. The district court reasoned that the Defendant did not allege that the State failed to satisfy its Brady obligations regarding this evidence during his prosecution or that he had been denied a fair trial based on the refusal to grant access to the evidence. Id. at 803. The district court further concluded that the Defendant could not show that the evidence would have been favorable to his defense at trial because it remained "purely a matter of speculation" whether the evidence he requested would "tend to exculpate or otherwise prove favorable to him." Id. The district court also said, "Brady and the due process principle it vindicates [were] not implicated and d[id] not provide [the Defendant] with a due process right to the post-conviction release of evidence related to his conviction." Id.

The Sixth Circuit affirmed the district court's dismissal of the Defendant's petition. See Alley, 2006 WL 1313364, at *1. The Sixth Circuit agreed with the district court that there was no general constitutional right to post-conviction DNA testing. Id.

Relative to the Defendant's procedural due process claim, the Sixth Circuit specifically held,

[W]e concur with the district court's finding that [the Defendant] enjoys no procedural due process right to post-conviction DNA testing. Nor does [the DNA Act] create such a right. . . . The state-imposed requirements for

securing DNA analysis under the [DNA] Act do not themselves create any unconstitutional deprivation. Finally, [the Defendant] was not deprived of his right under state law to petition for DNA analysis. His petition was simply denied under state law.

See Alley, 2006 WL 1313364, at *2. As for substantive due process, the Sixth Circuit agreed with the district court that the court clerk's denial of the Defendant's request for access to the evidence did not "shock the conscience," observing that the court clerk had acted consistently with state law. Id. The court further held that there was no error of constitutional proportions because it was "neither arbitrary nor capricious for [the district attorney general] to defend legally what ha[d] to date been viewed as valid state practice in the handling of extremely belated requests for examination of alleged DNA evidence." Id. Also, the Sixth Circuit confirmed that the Defendant did not have a substantive due process right to clemency proceedings and that, therefore, no such right could attach to procedures like the access and testing desired by the Defendant. Id. Finally, the Sixth Circuit concurred with the district court's analysis rejecting the Defendant's separate due process claim under Brady. Id.

On May 19, 2006, the Defendant filed a second petition for post-conviction DNA analysis in the Shelby County Criminal Court. See Sedley Alley v. State, No. W2006-01179-CCA-R3-PD, 2006 WL 1703820, at *2 (Tenn. Crim. App. June 22, 2006), perm. app. denied (Tenn. June 27, 2006), cert. denied, 548 U.S. 922 (2006) ("Alley II"). In this petition, the Defendant requested testing of several items omitted from his first petition under the DNA Act, including: (1) skin cells/sweat from the men's red underwear that were found next to the victim's body and believed to have been worn by the assailant; (2) blood or skin cells on a stick used to violate the victim, including the paper in which the stick was wrapped; and (3) material from underneath the fingernails of the victim. Id. at *2-3. The Defendant asserted that "these items," "in addition to the swabs from the victim possibly containing semen, could be subjected to STR DNA testing to conclusively prove (or disprove) [the Defendant's] innocence." Id. at *3. He also requested DNA testing on "blood and a hair found on and in his car that were directly linked to the victim at trial using primitive ABO testing and microscopic hair analysis." Id.

According to the Defendant, DNA testing of these items had the potential of identifying the real perpetrator of the crime. Alley II, 2006 WL 1703820, at *3. Specifically, the Defendant "asserted that 'redundant results' (DNA tests results that established the same genetic profile on a number of probative items of evidence) could have established the true perpetrator of the crime and exclude[d] him as the perpetrator." Id. While he asserted that testing of the aforementioned items would have most clearly exonerated him, "he further argued that testing of additional items should [have] be[en] subjected to examination as these items could [have] contain[ed] additional evidence and

create[d] additional redundant results." Id. Those items included: (1) a sleeveless jersey-type shirt; (2) one white tube-sock belonging to the victim; (3) one pair of jogging shorts belonging to the victim; (4) the victim's bra; (5) the victim's white cotton panties; (6) a blue exercise belt belonging to the victim; (7) a left jogging shoe belonging to the victim; (8) a right jogging shoe belonging to the victim; (9) Styrofoam drinking cups; (10) bloodstained grass collected from beneath the victim's vaginal area; and (11) beer bottles. Id.

Furthermore, the Defendant maintained that testing of these items could have "very well established" a DNA match to the victim's boyfriend, John Borup, who admitted to being with the victim on the night of her murder. Alley II, 2006 WL 1703820, at *3. According to the Defendant, Mr. Borup more closely matched the description of the abductor, and Mr. Borup drove a dark, wood-paneled Dodge Aspen station wagon at the time of the murder. Id. The Defendant asserted that DNA testing results could have been entered into CODIS[4] or a state DNA database, and "score[d] a 'hit' to a convicted offender, thus not only exonerating [the Defendant], but also identifying the actual assailant." Id. In this regard, the Defendant maintained that he had "the right to do DNA testing of the crime scene evidence to prove third-party guilt, whether that c[ame] about by linking DNA from the crime scene evidence to a convicted offender in the CODIS database or directly to Mr. Borup." Id.

The Defendant further contended that in making the determination of whether he would have been prosecuted in light of exculpatory DNA results, the reviewing court was not limited to the evidence introduced at trial, but was required to consider all of the evidence, including factual allegations developed by the Defendant post-judgment. Alley II, 2006 WL 1703820, at *3. In that regard, the Defendant contended that the court must consider the following: (1) evidence that the medical examiner had determined that the victim had died between 1:30 a.m. and 3:30 p.m., contrary to the State's theory at trial that the victim had died at 11:30 p.m.; (2) the Defendant had no motive to kill the victim, while her boyfriend did; (3) an expert, Dr. Richard Leo, had determined that the Defendant's confession was unreliable and not true; (4) the victim's boyfriend fit the description of the abductor as 5′8″, medium build, short dark brown hair, dark complexion, and no facial hair; (5) the victim's boyfriend drove a dark-colored Dodge Aspen station wagon; (6) the tire tracks and shoe prints from the abduction scene were not from the Defendant's station wagon or from his shoes; and (7) hairs and fingerprints found on items near the victim's body did not belong to the Defendant. Id. at *3-4.

The trial court denied post-conviction DNA testing, determining that the Defendant had "failed to meet the statutory requirements which would mandate DNA Analysis as

---

[4] "CODIS" stands for Combined DNA Index System, and it is a federal database containing multiple DNA profiles from convicted felons.

outlined in Tenn[essee] Code Ann[otated section] 40-3[0]-304 and ha[d] not convinced th[e] court that discretionary analysis should [have] be[en] granted under" Code section 40-30-305. Alley II, 2006 WL 1703820, at *4. Specifically, the trial court held,

> With regard to requirements of Tenn[essee] Code Ann[otated section] 40-3[0]-304, the court finds that [the Defendant] has failed to demonstrate that a reasonable probability exists that . . . he would not have been prosecuted or convicted if exculpatory results had been obtained through DNA analysis of the requested samples; has failed to demonstrate that some of the samples sought are still in existence and/or are in a condition that is suitable for testing; and [the Defendant] has failed to demonstrate that the purpose of the petition is to determine actual innocence and not merely to delay the execution of his sentence. See Tenn. Code Ann. § 40-30-304(1), (2), and (4). Thus, testing is not mandated in this case.
>
> Additionally, this court finds that the [Defendant] has failed to demonstrate that a reasonable probability exists that analysis of said evidence will produce DNA results which would have rendered the [Defendant's] verdict or sentence more favorable if the results had been available at the proceeding leading to the judgment of conviction. See Tenn. Code Ann. § 40-30-305. Thus, this court is not inclined to order testing under the discretionary portion of the [DNA] Act[.]

Id.

On appeal, this court affirmed. Alley II, 2006 WL 1703820, at *24. At the outset, this court addressed the Defendant's request "to discredit or ignore certain evidence introduced at trial and to consider newly discovered evidence tending to exculpate the Petitioner, that is, the same evidence argued in the 2004 petition." Id. at *7. In denying this request, this court stated,

> The [DNA] Act does not require nor permit the lower court to re-evaluate the credibility or validity of the evidence submitted at trial. Nor does the [DNA] Act permit the court to consider new evidence, aside [from] DNA test results, supporting a different theory than the one relied upon by the [Defendant]. The [DNA] Act is not the proper vehicle to seek review of evidence other than results available from DNA testing of biological specimens recovered during the course of the investigation or prosecution of the petitioner. See generally Tenn. Code Ann. § 40-30-302. Other avenues exist for

consideration of newly discovered evidence in both the state and federal courts.

Id.

This court next discussed the Defendant's argument "that he [was] entitled to have the results of the DNA testing compared to a third-party person and the results checked against known violators in a public DNA database," CODIS. Alley II, 2006 WL 1703820, at *8. The court noted the holding of Alley I that the purpose of the DNA Act was to establish the innocence of a petitioner and not to create conjecture or speculation that the act may have possibly been perpetrated by a phantom defendant. Id. at *9. The court then continued,

> The [DNA] Act's reach is limited to the performance of DNA analysis which compares the petitioner's DNA to samples taken from biological specimens gathered at the time of the offense. . . . This [c]ourt rejects any implied testing of third-party individuals or the need to "run" DNA testing results through a DNA database for "hits." . . . Nor can this [c]ourt endorse the [Defendant's] argument that Tennessee created a "liberty interest" in using DNA testing to prove third-party guilt. . . . And, while there may be a liberty interest in testing biological samples for DNA created by enactment of statutory provisions, such right to access potentially exculpatory evidence does not remain unconditional. . . . Any interest created by enactment of the [DNA] Act created a limited interest of a defendant in establishing his/her innocence and did not create an interest in establishing the guilt of a speculative and unknown third party.

Id. (internal citations omitted). The court concluded, "The results of DNA testing must stand alone and do not encompass a speculative nationwide search for the possibility of a third-party perpetrator. Thus, the DNA analysis is limited to showing that the biological specimen did not belong to either the [Defendant] or the victim." Id. Despite this holding, the court again engaged in an analysis of the evidence and the possibility of a match to third-party individual.

First, the court determined that the record supported the trial court's conclusion that several items were no longer in existence for DNA testing or in a condition suitable for DNA testing: (1) blood and hair found in the Defendant's vehicle; (2) broken fingernail obtained from the victim; (3) samples taken from the victim and the Defendant; and (4) swabs taken from the victim's body. Alley II, 2006 WL 1703820, at *13. The court proceeded with analysis of the remaining items, those being (1) men's red underwear; (2) a stick and paper in which the stick was wrapped; (3) a sleeveless jersey-type shirt; (4) one white tube-sock belonging to the victim; (5) one pair of jogging shorts belonging to the

- 11 -

victim; (6) the victim's bra; (7) the victim's white cotton panties; (8) a blue exercise belt belonging to the victim; (9) a left jogging shoe belonging to the victim; (10) a right jogging shoe belonging to the victim; (11) Styrofoam drinking cups; (12) bloodstained grass collected from beneath the victim's vaginal area; and (13) beer bottles. Id.

In analyzing these items, this court noted the trial court's findings that the Defendant had not established that biological specimens were present on many of the items of evidence for which he sought testing. Alley, 2006 WL 1703820, at *16-22. The court also found that there was an issue of contamination of certain physical evidence because it had been in the custody of the Shelby County Criminal Court Clerk's Office for twenty or more years. Id. at *17, *22-23. Regardless, this court agreed with the trial court that even if testing of these items did reveal the presence of a third-party's DNA, the Defendant had failed to establish, in light of the evidence of his guilt, that (1) a reasonable probability existed that the Defendant would not have been prosecuted or convicted if exculpatory results had been obtained through DNA analysis or (2) a reasonable probability existed that analysis of the evidence would have produced DNA results which would have rendered the Defendant's verdict or sentence more favorable if the results had been available at the proceedings leading to the judgment of conviction. Id. at *15-24. Lastly, the court held that the belated DNA requests shortly before the dates of his scheduled execution "were made for the purpose of delaying the execution of the sentence." Id. at *24.

Relative to the Defendant's request for consideration of "redundant" test results that would have established his innocence of the murder, this court remained unpersuaded by such argument. Alley II, 2006 WL 1703820, at *16. We reasoned,

> This [c]ourt is not inclined to disregard the overwhelming evidence against the [Defendant] and, at this late date, embrace an entirely new theory of the crime. Even assuming that DNA testing of the numerous items requested by the [Defendant] would generate results indicating an absence of the [Defendant's] DNA from these items, this would not, with consideration of the plethora of credible evidence against the [Defendant], establish his innocence of the murder or convince this [c]ourt that he would have been neither prosecuted nor convicted if this DNA evidence had been revealed to the jury.

Id. Thereafter, the Defendant was executed on June 28, 2006.

Almost five years later in 2011, our supreme court specifically overruled the holding of Alley II that the DNA Act did not encompass matching DNA results to third-party via law-enforcement databases. Powers v. State 343 S.W.3d 36, 47-53 (Tenn. 2011). In Powers, the petitioner argued that exculpatory results would have created a reasonable probability that he would not have been prosecuted or convicted if "the DNA profile

- 12 -

developed from the evidence was uploaded into a DNA database and matched another profile in the system." Id. at 39. On appeal, this court affirmed the denial of relief, relying on our previous holding in Alley II. Id. at 43. However, our supreme court reversed, holding that DNA results obtained under the provisions of the DNA Act may be compared with profiles contained in a database. Id. at 49-50. Our supreme court reasoned that this court's limited interpretation of "DNA analysis" was incorrect and that "[t]here [was] nothing in the[] provisions [of the DNA Act] limiting the DNA analysis" to a comparison between crime scene evidence and only a petitioner's DNA samples. 343 S.W.3d at 49. Instead,

> [i]f the comparison between a DNA profile developed from crime scene evidence and a petitioner's DNA profile d[id] not return a match, and uploading the crime scene DNA profile into a database ha[d] the potential to establish a petitioner's innocence and identify the true perpetrator of the crime, then the trial court [could] issue an order providing for such a comparison.

Id.

On April 30, 2019, the Estate, with the Defendant's daughter as the Estate's representative, filed the instant petition for post-conviction DNA testing. In the petition, the Estate sought testing of the following items: (1) men's red underwear; (2) the victim's t-shirt; (3) a stick used to murder the victim and the wrapping in which the stick was placed; (4) blood-stained grass; (5) the victim's bra; (6) the victim's shoes; (7) a white tube-sock; (8) Styrofoam cups; (9) the victim's shorts; (10) the victim's underwear; (11) the victim's exercise belt; (12) a beer bottle; (13) the Defendant's shorts; (14) the screwdriver found at the scene; and (15) napkins discovered near the victim's body.[5] According to the Estate, given the holding of Powers and the reversal of Alley II, "there [was] no legitimate question that [the Defendant] would [have] be[en] entitled to DNA testing to determine actual innocence and the identity of the real killer under" the DNA Act. The Estate continued,

> Both the law and DNA science have evolved since 2006. The evidence to be tested is still in existence and is preserved by the Shelby County Criminal Court Clerk's Office. And there is a reasonable probability that [the Defendant] would not have been convicted or executed if DNA testing results are exculpatory on the material items of evidence recovered from the crime scene.

---

[5] Only three items in this 2019 petition were not the topic of the prior two petitions or Section 1983 action—(1) the Defendant's shorts; (2) the screwdriver found at the scene; and (3) napkins discovered near the victim's body.

The Estate contended that the Defendant's daughter, as personal representative of the Estate, now stood "in the shoes of her father, seeking the truth."

The Estate asserted that the DNA Act also contemplated advancements in science that might necessitate a re-testing of the evidence. The Estate indicated that the DNA testing available in 2004 and 2006 would have required a larger amount of DNA to produce reliable results and that improvements in STR testing allowed for results to be obtained even where sample sizes were very small. The Estate cited advancements in "mini-STR testing," "Y-STR testing," and "Mega-Plex STR testing" that could potentially be helpful in the analysis of the evidence in the case. The Estate further proposed using genealogy services to conduct additional third-party investigation in addition to the CODIS or other third-party databases.

The Estate contended that this court should consider the following post-judgment evidence in its analysis: (1) Dr. Richard Leo's report, wherein he had determined that the Defendant's confession was unreliable and not true; (2) autopsy records showing that the Defendant never hit the victim with a screwdriver or impaled her head with a screwdriver; (3) the tire tracks and shoe prints from the abduction scene were not from the Defendant's station wagon or from his shoes; (4) the victim's fingerprints were not found inside the Defendant's car; (5) the description of the perpetrator provided by a witness did not match the Defendant's description. The Estate maintained that it had never received a full and fair hearing on the Defendant's guilt or innocence, especially noting that "when there was an opportunity to do DNA testing that would [have] determine[d] whether [the Defendant] or someone else committed this crime, the post-conviction and appellate courts in [the Defendant's] case, as admitted by the Tennessee Supreme Court in 2011 in Powers, got the analysis wrong."

The Estate asserted that there was a possibility that DNA analysis of the evidence would show that Thomas Bruce was in fact the perpetrator of the victim's beating, assault, and murder. The Estate indicated, "Thomas Bruce, now under indictment in St. Louis, Missouri for homicide and rape, might be a serial offender, and Bruce was taking courses from the same Avionics Training School in Millington, Tennessee that [the victim] attended in the months prior to the homicide."

In the petition, the Estate asked to test for DNA on the existing evidence against preserved samples of the Defendant's, as well as those contained in CODIS. According to the Estate, the absence of the Defendant's DNA on the tested items would have undermined the State's theory that the Defendant was the person who committed this murder. The Estate continued, "If a number of these items . . . produced a male DNA profile that matched each other, but excluded [the Defendant], these redundant results would further strengthen the inference that a man other than [the Defendant] committed this crime." Furthermore, in the Estate's opinion, "[i]f testing of these items of evidence produced a

- 14 -

DNA profile that produced a 'hit' or matched a profile of an offender in the FBI's CODIS DNA database, that would be powerful exculpatory evidence that a person other than [the Defendant] committed the murder."

The State filed its response to the petition for DNA testing on May 31, 2019. The State initially raised several procedural claims, arguing that the Estate lacked standing under both the DNA Act and the doctrine of justiciability. First, the State argued that the Estate was not a "person convicted of and sentenced for first degree murder" within the meaning of Tennessee Code Annotated section 40-30-303. The State asserted that an estate did not qualify as a "person" within the meaning of other sections of state law, nor did an estate qualify as a "person" within the meaning of the DNA Act. The State asserted the DNA Act contemplated actions filed by a petitioner whose sentence had not been fully executed, not by the estate of a deceased petitioner. Second, the State argued that any rights the Defendant might have had to post-conviction DNA testing did not survive his death. Specifically, the State contended that the DNA Act did not contain a provision authorizing the survivability of such a claim. Other sections of Tennessee law explicitly provided for the survivability of certain actions on behalf of deceased litigants, the State claimed, but the right to bring a post-conviction claim was not so enumerated. Third, the State alleged that the present petition was not "otherwise justiciable." In addition to the lack of standing, the State argued the Estate had not suffered any injury, nor could the courts provide any redress to the Estate given that the Defendant had been executed. Furthermore, the State claimed that the Defendant's execution (and the court's inability to provide relief) rendered the petition for relief moot. Fourth, the State submitted that the current petition was untimely. While Tennessee Code Annotated section 40-30-303 allowed a petition for post-conviction DNA testing to be filed "at any time," the State claimed that the phrase "at any time" did not encompass a period beyond a petitioner's death or the expiration of his sentence (which in this case were one and the same). Fifth, the State argued that the current petition was precluded by the principles of res judicata and collateral estoppel.

Responding to the Defendant's substantive claims, the State speculated that certain evidence might be tainted after years in the State's custody and claimed that the Estate had "not shown that much of the evidence [was] still in existence or in a condition that DNA analysis could be conducted." The State further opposed the Estate's proposal to use genealogy services to conduct additional third-party investigation, contending that such testing went "well beyond the scope of the [DNA] Act." Finally, the State argued that even if DNA testing produced exculpatory results, the Defendant would still have been prosecuted and convicted based on his confession and other evidence, and there was no "reasonable probability" of a different result even if the DNA on all of the physical evidence did not match the Defendant.

- 15 -

Following the post-conviction court's June 2019[6] hearing, the Estate filed a memorandum of law responding to the State's assertions. In its response, the Estate contended: (1) The authority to which the State cited actually supported the Estate's contention that civil rules of procedure apply to this case and that; therefore, the Defendant's right to DNA testing was not abated by his death; (2) The plain language of the post-conviction DNA testing statute did not preclude the Estate's right to DNA testing, as the DNA Act did not require that the "person" seeking testing be in custody or subject to supervised release and the DNA Act allowed the "person" to bring the claim "at any time"; (3) The plain language of other statutes, including statutes dealing with exoneration, expunction, compensation, and the like, made clear that the legislature intended such claims to survive death; (4) The Estate did meet traditional standing requirements because the Defendant's daughter did suffer "distinct and palpable injuries" as a result of her father's execution; these injuries were traceable to state action, and these injuries could be redressed by a favorable decision, which would in turn entitle the Estate to compensation; and (5) Collateral estoppel, res judicata, and law of the case doctrines did not bar litigation of the current petition; and (6) The Estate had a constitutional right to DNA testing.

The State filed an additional responsive pleading on September 12, 2019. In the response, the State asserted, among other things, that post-conviction proceedings were not bound by the Tennessee Rules of Civil Procedure or statutes governing survivorship of tort actions and that the Estate had no constitutional right to bring a post-conviction action. The Estate filed a final sur-reply, arguing that the State's position misunderstood the nature of collateral review and failed to account for vital constitutional interests at stake.

A hearing was held on October 14, 2019, where both sides presented argument. Thereafter, on November 18, 2019, the post-conviction court entered an order dismissing the petition, finding that the Estate did not have standing to file a petition for DNA analysis under the DNA Act and that, therefore, the post-conviction court was without subject matter jurisdiction to consider the petition. The post-conviction court found that the plain language of the DNA Act restricted petitioners to "person[s] convicted of and sentenced for the commission of" certain offenses and that the DNA Act did not include a survivability provision so that an estate of a deceased individual could request DNA testing. The post-conviction court also concluded that the statutes, court rules, and caselaw relevant to civil proceedings were generally inapplicable to post-conviction proceedings and rejected the contention that survivability provisions found in another part of the Tennessee Code regarding civil actions applied to the DNA Act. The post-conviction court further ruled that the statutes relevant to exoneration did not confer any right of exoneration or exoneration-based compensation to deceased persons or their estates. Finally, the post-conviction court determined that the Estate had no due process right, either in the form of

---

[6] There is no transcript of this hearing included in the appellate record. This hearing is referenced in the post-conviction court's order denying relief.

property rights or in the form of a liberty interest in proving innocence, to DNA testing and that the Defendant had been provided with the opportunity to raise his claim in a meaningful time and in a meaningful manner, his having had multiple attempts to raise post-conviction DNA claims before his execution. This appeal followed.

ANALYSIS

On appeal, the Estate argues that the DNA Act authorizes the estate of an deceased defendant to petition for DNA testing. According to the Estate, the Defendant's right to petition for DNA testing passed to his Estate after his execution under the applicable civil survivorship statutes.

*I. Plain Language of the DNA Act*

The Estate argues that Tennessee law empowers courts to supply rules of procedure where none are specified and notes that under Watkins v. State, 903 S.W.2d 302, 305 (Tenn. 1995), post-conviction proceedings are "a hybrid affair, involving an appeal from a criminal prosecution which is considered under the civil rules of procedure." The Estate extrapolates that the DNA Act, which does not address survivability, should be held to authorize the Estate to petition for DNA testing by applying Tennessee's civil rules of survivorship. Specifically, the Estate requests that this court view a DNA petition under the DNA Act as a civil action and apply the right of survivorship found in Tennessee Code Annotated section 20-5-102. That section provides,

> No civil action commenced, whether founded on wrongs or contracts, except actions for wrongs affecting the character of the plaintiff, shall abate by the death of either party, but may be revived; nor shall any right of action arising hereafter based on the wrongful act or omission of another, except actions for wrongs affecting the character, be abated by the death of the party wronged; but the right of action shall pass in like manner.

Tenn. Code Ann. § 20-5-102.

We agree with the State that the Estate weaves several arguments throughout its first issue, intertwining the facts of the Defendant's case with the language of the DNA Act and the applicability of procedural rules in other post-conviction arenas, as well as arguing principles of fairness given that the Defendant was twice denied DNA testing based upon reasoning that was later overruled in part. In addition, we disagree with the Estate that the "relevant legal question" is not whether the Estate is a "person convicted of and sentenced for" first-degree murder, but whether the cause of action created by the DNA Act survives a person's death. The language of the DNA Act confers standing to a "person convicted of and sentenced for" certain offenses, here, first-degree murder. Merely because

survivability is not specifically discussed in the DNA Act does not mean that the DNA Act is unclear or ambiguous regarding standing. We believe the threshold question here is a simple one, being one of statutory construction—whether the plain language of the DNA Act gives a deceased person's estate standing to bring a DNA petition. Accordingly, a review of the statutes at issue, as well as a review of principles of statutory interpretation, are paramount to this decision.

Issues of statutory construction are questions of law, which this court reviews de novo with no presumption of correctness. State v. Henderson, 531 S.W.3d 687, 692 (Tenn. 2017) (citing State v. Springer, 406 S.W.3d 526, 532-33 (Tenn. 2013)). Our supreme court has given guidance with regard to the interpretation of statutes, stating,

> The overriding purpose of a court in construing a statute is to ascertain and effectuate the legislative intent, without either expanding or contracting the statute's intended scope. Legislative intent is first and foremost reflected in the language of the statute. We presume that the [l]egislature intended each word in a statute to have a specific purpose and meaning. The words used in a statute are to be given their natural and ordinary meaning, and, because words are known by the company they keep, we construe them in the context in which they appear and in light of the general purpose of the statute. We endeavor to construe statutes in a reasonable manner which avoids statutory conflict and provides for harmonious operation of the laws. When a statute's text is clear and unambiguous, we need look no further than the language of the statute itself. We simply apply the plain meaning without complicating the task.
>
> When, however, the language of a statute is ambiguous, we resort to rules of statutory construction and external sources in order to ascertain and give effect to the legislative intent. These external sources may include the broader statutory scheme, the history and purpose of the legislation, public policy, historical facts preceding or contemporaneous with the enactment of the statute, and legislative history. The language of a statute is ambiguous when it is subject to differing interpretations which yield contrary results. This proposition does not mean that an ambiguity exists merely because the parties proffer different interpretations of the statute. A party cannot create an ambiguity by presenting a nonsensical or clearly erroneous interpretation of a statute.

Wallace v. Metro. Gov't of Nashville, 546 S.W.3d 47, 52-53 (Tenn. 2018) (quotation marks and citations omitted).

On July 18, 2001, our state passed the DNA Act. See Tenn. Code Ann. §§ 40-30-301 to -313. After reviewing the legislative history, our supreme court observed that the purpose of the DNA Act was two-fold: (1) to exonerate the wrongfully convicted who are still imprisoned and (2) to identify the true perpetrators of their crimes. See Powers, 343 S.W.3d at 51. Toward this end, the main operative provision of the DNA Act, Tennessee Code Annotated section 40-30-303, provides:

> Notwithstanding part 1 of this chapter, or any other provision of law governing post-conviction relief to the contrary, a person convicted of and sentenced for the commission of first degree murder, second degree murder, aggravated rape, rape, aggravated sexual battery or rape of a child, the attempted commission of any of these offenses, any lesser included offense of these offenses, or, at the direction of the trial judge, any other offense, may at any time, file a petition requesting the forensic DNA analysis of any evidence that is in the possession or control of the prosecution, law enforcement, laboratory, or court, and that is related to the investigation or prosecution that resulted in the judgment of conviction and that may contain biological evidence.

Tenn. Code Ann. § 40-30-303.

After notice to the prosecution and an opportunity to respond, the court shall order DNA analysis if it finds the following:

> (1) A reasonable probability exists that the petitioner would not have been prosecuted or convicted if exculpatory results had been obtained through DNA analysis;

> (2) The evidence is still in existence and in such a condition that DNA analysis may be conducted;

> (3) The evidence was never previously subjected to DNA analysis or was not subjected to the analysis that is now requested which could resolve an issue not resolved by previous analysis;

> (4) The application for analysis is made for the purpose of demonstrating innocence and not to unreasonably delay the execution of sentence or administration of justice.

Tenn. Code Ann. § 40-30-304. The provisions of this section are mandatory, meaning that if the post-conviction court finds that they are satisfied, it is without discretion to deny DNA analysis. However, "[t]he failure to meet any of the qualifying criteria is, of course,

fatal to the action." William D. Buford v. State, No. M2002-02180-CCA-R3-PC, 2003 WL 1937110, at *6 (Tenn. Crim. App. Apr. 24, 2003). Finally, a related provision provides for DNA analysis in the post-conviction court's discretion if the same factors are satisfied, but the results would only reduce the petitioner's offense level or sentence rather than completely exonerating him. See Tenn. Code Ann. § 40-35-305.

The Estate focuses on the non obstante clause that begins section 40-30-303, "Notwithstanding part 1 of this chapter, or any other provision of law governing post-conviction relief to the contrary," seemingly for the proposition that the DNA Act should be construed broadly. According to the Estate, though the DNA Act itself does not address whether the right to petition for DNA testing survives death, "it does make clear that any general rule about post-conviction relief becoming unavailable upon the death or execution of the inmate does not automatically apply to the DNA Act." Stated a different way, the Estate asserts, "The [DNA] Act furnishes rights notwithstanding the ordinary rules that govern post-conviction relief."

However, the non obstante clause merely objectifies the legislature's intention to allow DNA testing where other provisions might conflict. Such conflicting provisions can be found in the Chapter 1 and Rule 28, such as the statute of limitations, the presentation of only constitutional claims, and the filing of multiple petitions. Moreover, the non obstante clause is not a carte blanche exception for the DNA Act excluding it from all other provisions governing post-conviction petitions, it merely states that such provisions do not apply where they conflict. In addition, there is no "general rule" for survivorship in the post-conviction realm, either for DNA testing or otherwise. Therefore, this clause does not evidence any intent on the part of the legislature to broaden the meaning of the specific individual delineated by the DNA Act to seek relief, that being "a person convicted of and sentenced for the commission" of various enumerated offenses.

"Rather than speculating about the significance of provisions which are not included in the statute, a more effective method of understanding the intended purpose of the statute is to consider the words actually used." Fletcher v. State, 951 S.W.2d 378, 382 (Tenn. 1997). The legislature chose to use "person" in Code section 40-30-303. "We presume that every word in a statute has meaning and purpose and should be given full effect if so doing does not violate the legislature's obvious intent." In re C.K.G., 173 S.W.3d 714, 722 (Tenn. 2005).

The Tennessee Code generally defines "person" to include "a corporation, firm, company or association" "unless the context [of the Code section] otherwise requires." See Tenn. Code Ann. § 1-3-105(a)(19). Relying on this general provision, the Estate argues that the context of the term "person" as used in the DNA Act requires that an estate be included with the definition because an estate steps into the shoes of the decedent. We disagree. First, the definition of person in Code section 1-3-105(a)(19) makes no reference

- 20 -

to either a criminal defendant or an estate. Moreover, the term as used in the DNA Act does not exist in isolation. Given the entire context of the phrase, that being "a person convicted of sentenced for" one of enumerated offenses, it is clear that the legislature intended only an individual to be able to bring a petition under the DNA Act. In addition, the term person as it is used in the DNA Act logically does not include "a corporation, firm, company or association." Therefore, we are unpersuaded by the Estate's argument in this regard that the DNA Act is ambiguous. Importing the general definition of "person" here from Code section 1-3-105(a)(19) is not logical. We reiterate that the language of a statute is ambiguous only when it is subject to differing interpretations that yield contrary results, that an ambiguity does not exist merely because the parties proffer different interpretations of the statute. Wallace, 546 S.W.3d at 53 (citations omitted).

When the legislature does not provide a specific definition for a statutory term, this court may look to other sources, including Black's Law Dictionary, for guidance. State v. Edmondson, 231 S.W.3d 925, 928 (Tenn. 2007). The word "person" is not a complex legal term, and we must give the word "person" its "natural and ordinary meaning." See, e.g., State v. Nikia Bowens, No. E2017-02075-CCA-R3-CD, 2018 WL 5279374, at *7 (Tenn. Crim. App. Oct. 23, 2018) (defining "building" as used in the burglary statute by giving it is natural and ordinary meaning). In "general usage," "person" is defined as "a human being (i.e. natural person)." Black's Law Dictionary at 1142 (6th ed. 1990); accord Webster's Third New International Dictionary at 1686 (1981) (defining "person" as "an individual human being" and "a living individual unit"). Black's Law Dictionary recognizes that "by statute[, the] term may include labor organization, partnerships, associations, corporations, legal representatives, trustees, trusts in bankruptcy, or receivers." Black's Law Dictionary at 1142. As such, in absence of a specific statutory term or definition, "person" is "well-understood to be a live human being," not a legal entity like a decedent's estate. See State ex rel. Grant County Commission v. Nelson, --- S.E.2d ----, 2021 WL 1100165, at *10-11, *11 n.2 (W. Va. Mar. 22, 2021) (J. Wooten, concurring) (noting Black's Law Dictionary's definition of the term "person" and concluding that when "person" is not defined by statute, it does not include a statutory entity like the Commission). Likewise, the Tennessee Supreme Court has declined to expand the definition of "person" beyond its ordinary meaning to include government entities. See Moreno v. City of Clarksville, 479 S.W.3d 795, 812-14 (interpreting the relevant provision in the Claims Commission Act, Tennessee Code Annotated section 9-8-402(b), which stated that the filing of the written notice in the Claims Commission "toll[ed] all statutes of limitations as to other persons potentially liable" due to the occurrence that was the subject of the claim, did not apply to governmental entities such as the City of Clarksville); see also Daniel v. Hardin Co. General Hosp., 971 S.W.2d 21, 25 (Tenn. Ct. App. 1997) (declining to apply a ninety-day window in the 1993 version of Code section 20-1-119, which extended the expired statute of limitations to add "a person not a party to

- 21 -

the suit," to the statute of limitations in GTLA claims because Code section 20-1-119 did not reference GTLA or governmental entities).

In addition, we observe that there are clear instances in our statutes where the legislature has intended to the expand the ordinary meaning of "person" and provided a specific statutory definition. For example, Tennessee's comparative fault statute defines "person" to mean "any individual or legal entity," see Tennessee Code Annotated section 20-1-119(f), and the Drug Dealer Liability Act defines a "person" as "individual, governmental entity, corporation, firm, trust, partnership, or incorporated or unincorporated association, existing under or authorized by the laws of this state, another state, or foreign country," see Tennessee Code Annotated section § 29-38-104(11). The legislature has not chosen to adopt a specific definition of the term "person" for purposes of the DNA Act.

The Estate contends that "[s]tatutes do not say that any 'person or his Estate' may pursue a cause of action" and that because an Estate stands in the shoes of a decedent, such language would be superfluous. We disagree. See Estate of Kuba by Kuba v. Ristow Trucking Co., Inc., 508 N.E.2d 1 (Ind. 1987) (holding that given the language of the applicable provision of Indiana's wrongful death statues, the definition of "person" did not include an estate and that the estate was precluded from bringing a claim); In re Estate of Gottier, 475 P.3d 1144, 1147-48 (Ariz. Ct. App. 2020) (concluding that the estate was not included within the definition of "person" for purposes of Arizona's Insurance Code); see also 26 United States Code Annotated § 7701(a)(1) (the Internal Revenue Code's defining "person" to include "an individual, a trust, estate, partnership, association, company or corporation") (emphasis added)); 29 United States Code Annotated § 1002(9) (the Employee Retirement Income Security Act of 1974's defining "person" to include a "partnership, joint venture, corporation, mutual company, joint-stock company, trust, estate, unincorporated organization, association, or employee organization" (emphasis added)); Hyde v. Harrison County, 607 S.W.3d 106, 113 (Tex. Ct. App. 2020) (citing to a Texas statute that defined "person" as "[a] corporation, organization, government or governmental subdivision or agency, business trust, estate, trust, partnership, association, and any other legal entity") (emphasis added)). The legislature's omission of a provision in a statute is deemed intentional and significant. See State v. Whited, 506 S.W.3d 416, 439-40 (Tenn. 2016); State v. Davis, 940 S.W.2d 558, 561-62 (Tenn. 1997).

Finally, we examine this holding in light of the DNA Act's purposes, which as noted above are two-fold: (1) to exonerate the wrongfully convicted who are still imprisoned and (2) to identify the true perpetrators of their crimes. See Powers, 343 S.W.3d at 51. In Powers, our supreme court observed the following circumstances that led to the enaction of the DNA Act in this state and others:

While known for its crime-solving capabilities, "from its earliest days, DNA typing has also served a second function of equal importance: the determination of a person's innocence." DNA analysis was first used in a forensic setting in 1986 in an attempt to solve two rape-murders in England. Although a man confessed to one of the murders, DNA analysis revealed that the man's profile did not match the semen collected from either crime scene and he was eliminated as a suspect. DNA analysis was used three years later in the United States to exonerate Gary Dotson, a man who had served ten years in an Illinois prison for a crime that he did not commit. Because of the lack of available remedies in the state or federal courts when a convicted defendant sought post-conviction access to DNA analysis, the states began to enact legislation affording a right to such testing. Illinois and New York were the first, passing such legislation in 1999. Today, forty-eight states and the federal government have enacted statutes or rules providing for post-conviction access to DNA analysis. Since Gary Dotson's exoneration in 1989, over 250 people have been exonerated through post-conviction DNA analysis. Of the first two hundred exonerations, almost one-fourth occurred because the DNA evidence taken from the crime scene matched the profile of a perpetrator that was already uploaded in a DNA database.

Id. at 46-47 (citations and internal quotation marks omitted)

Thus, we observe that the impetus for the DNA Act, in this state and others, was to exonerate the wrongfully convicted who were still imprisoned. See id. at 50-51 (noting Tennessee's legislative history comments, "I think it's . . . important . . . to the person [who] is serving the time [who has] been innocent all along," and, "If it frees people [who] are unlawfully and improperly jailed, it's the best thing we can do, because these people are having their liberty taken from them unlawfully and unjustly"). When the prisoner has died, ordering DNA testing no longer serves this function. As for the DNA Act's secondary purpose of law enforcement, that being finding the true perpetrator of the crime, a petition for DNA analysis under the DNA Act is not the State's only mechanism for DNA testing, though the State may not frequently choose to do so of its own volition. Nonetheless, because it is the State and the public at large that benefit from this purpose, not the wrongfully convicted individual, it is the State that is tasked with achieving the law enforcement objective, not a deceased prisoner's estate. Finally, there is no evidence that the legislature enacted the DNA Act for the purpose of compensating the families of the wrongfully convicted.

We conclude that it was not the obvious intent of the legislature to include any civil right of survivorship in the word "person" in Code section 40-35-303. In this court's view, had the legislature intended for someone to be able to file a petition for post-conviction

- 23 -

DNA testing on behalf of a statutorily eligible person who had died, such a provision would have been placed in the appropriate statutes. This conclusion, we believe, is rooted in principles of statutory construction. Based upon our holding, there is no need to regress into an extensive discussion regarding the hybrid nature of post-conviction proceedings and in what context civil procedure rules might be adopted or to discuss standing-related caselaw.

We also observe that this result is consistent with caselaw in other contexts that collateral attacks on a prisoner's criminal judgment ends with the death of the prisoner. The State aptly cites to caselaw from writ of habeas corpus actions where courts have concluded that a petitioner's habeas petition was rendered moot by his death. Keitel v. Mazurkiewicz, 729 F.3d 278, 280 (3d Cir. 2013) (collecting cases); Bruno v. Sec'y, Fla. Dep't of Corr., 700 F.3d 445, 445 (11th Cir. 2012); McMillin v. Bowersox, 102 F.3d 987, 987 (8th Cir. 1996). "[U]nless a judgment and sentence in a capital case is stayed pending post-conviction proceedings, those post-conviction proceedings would be rendered moot by carrying out the sentence of death." State v. Beam, 766 P.2d 678, 682 (Idaho 1988).

The Estate responds to this line of caselaw by arguing that it is not bringing a collateral attack on the Defendant's conviction or sentence, but rather, it is petitioning for DNA testing pursuant to a statutory action that allows for such "at any time" if the relevant criteria are met. See Tenn. Code Ann. § 40-30-303. However, for the reasons given above, this is not a cause of action that the legislature intended to survive death. The primary purpose of the DNA Act is to exonerate the wrongfully convicted who are still imprisoned via post-conviction relief, and by that very nature, it is a collateral attack on the conviction and sentence. See Kutzner v. Johnson, 303 F.3d 333, 338 (5th Cir.) (noting that motions for DNA testing are a collateral attack on the conviction and are subject to the prohibition of successive habeas petitions), cert. denied, 536 U.S. 978 (2002). The State has a legitimate interest in finality, and we are not obliged to open the door to posthumous litigation by probate estates absent a clear directive from our legislature to do so. The Estate's argument that the 2011 holding of Powers somehow changes this result does not persuade us to the contrary for reasons discussed below.

*II. Constitutional Claims*

Next, the Estate argues that if "the [DNA] Act is incapable of vindication here, then the DNA Act would be unconstitutional as applied to this case." The Estate submits that the United States and Tennessee Constitutions require that the Estate be permitted to petition for DNA testing under the DNA Act, noting that although the State may not be required to provide a mechanism for DNA testing, once it makes testing available, the applicable procedures must comply with constitutional requirements. Specifically, the Estate argues that extinguishing the deceased Defendant's right to petition upon his execution by the State violates due process because it ignores the significant private

- 24 -

interests in obtaining DNA testing, results in almost certain deprivation of the vital property and liberty interests at stake, allows the State to cover up its own potential execution of an innocent person, and is completely at odds with the State's interest in identifying the victim's murderer. In addition, the Estate contends that the Tennessee Constitution's "reputational guarantee" requires that the Estate be permitted to petition for DNA testing on the deceased Defendant's behalf.

The Estate, citing Whitehead v. State, 402 S.W.3d 615, 622-23 (Tenn. 2013), submits that because Tennessee has chosen to provide a post-conviction procedural right to seek DNA testing, the procedures available for defending that right must conform with the federal and state constitutions. According to the Estate, the Due Process Clause requires that the Estate be permitted to petition for DNA on the Defendant's behalf, thereby providing adequate protection for the important property and liberty interests at stake. The Estate asserts that there are three property interests at stake, those being the Defendant's reputational guarantee, the procedural rights created by the DNA Act, and in exoneration and non-discretionary exoneration compensation. The Estate also indicates that the following liberty interests are at stake—establishing the Defendant's innocence and "removing the stigma of a conviction for first-degree murder." The Estate concludes, "Whether framed as a property or liberty interest, the Estate's interest in bringing this petition is significant, the risk of erroneous deprivation is high, and the State's contrary interest is minimal."

Both the United States Constitution and the Tennessee Constitution protect the right to due process of law. Section 1 of the Fourteenth Amendment to the United States Constitution provides, "No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law[.]" In addition, article I, section 8 of the Tennessee Constitution states, "[N]o man shall be taken or imprisoned, or disseized of his freehold, liberties or privileges, or outlawed, or exiled, or in any manner destroyed or deprived of his life, liberty or property, but by the judgment of his peers or the law of the land." The Tennessee Supreme Court has held that article I, section 8 of the Tennessee Constitution is "synonymous" with the Due Process Clause of the Fourteenth Amendment. Gallaher v. Elam, 104 S.W.3d 455, 463 (Tenn. 2003) (citing Riggs v. Burson, 941 S.W.2d 44, 51 (Tenn. 1997)).

"Procedural due process rules are meant to protect persons . . . from the mistaken or unjustified deprivation of life, liberty, or property." Carey v. Piphus, 435 U.S. 247, 259 (1978). For procedural due process claims, "the deprivation by state action of a constitutionally protected interest in life, liberty, or property is not in itself unconstitutional; what is unconstitutional is the deprivation of such an interest without due process of law." Zinermon v. Burch, 494 U.S. 113, 125 (1990) (citations and internal

quotation marks omitted). "Such rules 'minimize substantively unfair or mistaken deprivations of' life, liberty, or property by enabling persons to contest the basis upon which a State proposes to deprive them of protected interests." Carey, 435 U.S. at 259-60. This constitutional guarantee protects an individual from the erroneous exercise of the State's authority.

"All that [procedural] due process requires in the post-conviction setting is that the defendant have 'the opportunity to be heard at a meaningful time and in a meaningful manner.'" Stokes v. State, 146 S.W.3d 56, 61 (Tenn. 2004) (quoting Mathews v. Eldridge, 424 U.S. 319, 333 (1976)). In determining whether this requirement has been met, we must consider three factors established by the United States Supreme Court:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

Heyne v. Metro. Nashville Bd. of Pub. Educ., 380 S.W.3d 715, 732 (Tenn. 2012) (quoting Mathews, 424 U.S. at 335). Within this framework, we are mindful that "due process is flexible and calls for such procedural protections as the particular situation demands." Morrissey v. Brewer, 408 U.S. 471, 481 (1972).

Though the Estate asserts its claims under the guise of procedural due process, it intermingles notions of substantive due process throughout its arguments. Substantive due process claims deal with the reasonableness of the governmental decision. Substantive due process has been defined in the following way:

> In contrast to procedural due process, substantive due process bars oppressive government action regardless of the fairness of the procedures used to implement the action. Substantive due process claims are divided into two categories: (1) deprivations of a fundamental constitutional guarantee, and (2) government actions that are arbitrary, or conscience shocking, in a constitutional sense. Appropriate limits on substantive due process come not from drawing arbitrary lines but rather from careful respect for the teachings of history [and] solid recognition of the basic values that underlie our society.

Mansell v. Bridgestone Firestone North Am. Tire, LLC, 417 S.W.3d 393, 409 (Tenn. 2013) (citations and internal quotations marks omitted).

Substantive due process prohibits the States from infringing on fundamental liberty interests, regardless of the procedures provided, unless the infringement is narrowly tailored to serve a compelling state interest. Chavez v. Martinez, 538 U.S. 760, 775 (2003); Washington v. Glucksberg, 521 U.S. 702, 721 (1997); Reno v. Flores, 507 U.S. 292, 301-02 (1993). In order to qualify for such protection, the individual's fundamental rights and liberties must be "deeply rooted in this Nation's history and tradition" and "implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed." Glucksberg, 521 U.S. at 721 (citations and internal quotation marks omitted). "A substantive due process inquiry focuses on 'what' the government has done, as opposed to 'how and when' the government did it." See Amsden v. Moran, 904 F.2d 748, 754 (1st Cir. 1990). Individuals who claim that their right to substantive due process has been violated must show that the State's conduct shocks the conscience, interferes with rights implicit in the concept of ordered liberty, offends judicial notions of fairness, is offensive to human dignity, or is taken with deliberate indifference to protected rights. See Anderson v. Larson, 327 F.3d 762, 769 (8th Cir. 2003).

Not all property interests which fall under the protection of the procedural element of the Due Process Clause are protected under the substantive portion. Reich v. Beharry, 883 F.2d 239, 243-245 (3d Cir. 1989). Caselaw provides relatively little specific guidance as to what constitutes a property interest worthy of substantive due process protection. Nicholas v. Pennsylvania State Univ., 227 F.3d 133, 140 (3d Cir. 2000). Property rights are created and their dimensions are defined by existing rules and understandings that stem from independent sources such as state law. Bd. of Regents v. Roth, 408 U.S. 564, 577 (1972). However, the courts must look to federal law to determine whether a particular property right is entitled to substantive due process protection. Memphis Light, Gas & Water Div. v. Craft, 436 U.S. 1, 9 (1978).

*A. DNA Testing*

1. Substantive Due Process. Though the Estate specifically denounces any substantive due process claim, we are not completely persuaded that such is the case given the co-mingled nature of its arguments and usage of phrases such as "conscious-shocking." Accordingly, to any extent that the Estate's claims can be construed as raising issues of substantive due process, we briefly note that "there is no freestanding substantive due process right to DNA testing." Charles W. Elsea v. Neal Pinkston, et al., 1:19-cv-00287, 2020 WL 4043982, at *2 (E.D. Tenn. June 18, 2020) (quoting In re Frederick J. Smith, 349 F. App'x. 12, 15 (6th Cir. 2009) (citing District Attorney's Office for Third Judicial Dist. v. Osborne, 557 U.S. 52, 72 (2009))). We find further guidance in the United States Supreme Court's decision in Osborne.

In Osborne, the defendant, while alive and incarcerated in Alaska, unsuccessfully brought an action to compel release of certain biological evidence so that it could be

subjected to DNA testing. 557 U.S. at 55-62. The Supreme Court held that Alaska law governing procedures for post-conviction relief did not violate the defendant's substantive due process rights, reasoning that enacting a free-standing claim

> would take the development of rules and procedures in [the area of DNA testing] out of the hands of legislatures and state courts shaping policy in a focused manner and turn it over to federal courts applying the broad parameters of the Due Process Clause. There is no reason to constitutionalize the issue in this way.

Id. at 56. The Supreme Court later explained, "Osborne rejected the extension of substantive due process to this area, and left slim room for the prisoner to show that the governing state law denies him procedural due process." Skinner v. Switzer, 562 U.S. 521 (2011) (citing Osborne, 557 U.S. at 71-72). The Defendant simply did not have a substantive due process right to DNA testing of the evidence while alive, and by extension, the Estate possesses no such right.

Similar substantive due process claims made by the Defendant while he was still alive were likewise rejected. In the Defendant's Section 1983 action in the United District Court for the Western District of Tennessee, the district court determined that "[b]ecause there [was] no demonstrable state or federal entitlement to post-conviction release of the evidence on demand, [the court clerk's] refusal to do so [could] not 'shock the conscience[,]'" and second, that there was "no substantive due process right of access to evidence to present claims in executive clemency proceedings or otherwise[.]" Alley, 431 F. Supp. 2d at 801-02. On appeal, the Sixth Circuit affirmed. The Sixth Circuit, like the district court, concluded that the court clerk's denial of the Defendant's request for access to the evidence did not "shock the conscience," observing that the court clerk had acted consistently with state law. Alley, 2006 WL 1313364, at *2. The court further held that there was no error of constitutional proportions because it was "neither arbitrary nor capricious for [the district attorney general] to defend legally what ha[d] to date been viewed as valid state practice in the handling of extremely belated requests for examination of alleged DNA evidence." Id. We see no reason to depart from these holdings.

2. Procedural Due Process. Turning to procedural due process, the keystone of the Estate's constitutional claims, we note that State laws like Tennessee's Post-Conviction DNA Analysis Act may indeed create a liberty interest[7] in accessing biological evidence for testing. See Luis Castanon v. Victor S. Johnson, III, District Attorney for the Twentieth Judicial Dist. of Tenn., No. 12-5497, 2012 WL 10236221, *1 (6th Cir. Dec. 19, 2012); see also Elsea, 2020 WL 4043982, at *2. A prisoner may "have a liberty interest in

_____

[7] The Estate cites to no caselaw, and we know of none, that creates "a property interest in the procedural right created" by the DNA Act.

demonstrating his innocence with new evidence under state law" and the state's procedures must afford adequate access to information to vindicate that state's right to post-conviction relief. Osborne, 557 U.S. at 68-69, 72. Thus, a defendant may challenge a state's procedures for post-conviction access to evidence on due process grounds by showing the procedures are "fundamentally inadequate to vindicate the substantive rights provided." Id. at 69 (noting that "the question is whether consideration of [the defendant's] claim within the framework of the [s]tate's procedures for post-conviction relief 'offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental,' or 'transgresses any recognized principle of fundamental fairness in operation'") (quoting Medina v. California, 505 U.S. 437, 446, 448 (1992))); see also Alvin McLean v. Richard Brown, et al., No. 08 Civ. 5200, 2010 WL 2609341, at *7 (E.D.N.Y. June 25, 2010) (citing Osborne, 557 U.S. at 69). "A prisoner's post-conviction due process right to evidence is limited" and "extends only to the proper application of a state-created right to such evidence." McLean, 2010 WL 2609341, at *7.

In this regard, the Estate's argument is that the procedures of the DNA Act are themselves fundamentally unfair. Essentially, the Estate argues that it is fundamentally unfair for the Estate not to be considered a "person" within the parameters of the DNA Act if we interpret it that way, which we have done so in the section above. The Estate's argument focuses on the fact that Powers, after the Defendant's execution, overruled the holding in Alley II and that it was unfair to prohibit DNA testing of the evidence in this case against samples in the CODIS database. According to the Estate, the Defendant had a liberty interest created by the procedures of the DNA Act to allow access to DNA testing in order to prove his innocence and remove "the stigma of a conviction for first-degree murder."

Just as with the Defendant's substantive due process allegations, his claim of a violation of procedural due process was addressed by the federal courts while the Defendant was still alive. In the Defendant's action in the United District Court for the Western District of Tennessee, the district court rejected the Defendant's procedural due process allegation, reasoning that the Defendant had no state law right to the evidence and that "no court of binding or persuasive authority ha[d] concluded that federal law encompasse[d] such a right." Alley, 431 F. Supp. 2d at 801. Thus, because the Defendant could not articulate any established legal right to the evidence, he was not entitled to due process before being deprived of the evidence. Id. Relative to the Defendant's procedural due process claims, on appeal of the district court's decision, the Sixth Circuit specifically held,

[W]e concur with the district court's finding that [the Defendant] enjoys no procedural due process right to post-conviction DNA testing. Nor does Tennessee's Post-Conviction DNA Analysis Act create such a right. . .

- 29 -

.    The state-imposed requirements for securing DNA analysis under the [DNA] Act do not themselves create any unconstitutional deprivation. Finally, [the Defendant] was not deprived of his right under state law to petition for DNA analysis.  His petition was simply denied under state law.

See Alley, 2006 WL 1313364, at *2; see also Castanon, 2012 WL 10236221, at *1.  Again, we see no reason to depart from these holdings.  We conclude that the State's procedures were fundamentally adequate to protect the Defendant's liberty interest created by the DNA Act.

Even if the rulings in federal courts did not foreclose the present aspect of the Estate's procedural due process claim, the Estate's complaint fails to show that the DNA Act, as applied in this case, violates procedural due process.  See Castanon, 2012 WL 10236221, at *2.  The Estate alleges that the DNA Act deprived the Defendant of his procedural due process rights because the law was incorrectly applied to him as later decided in Powers and that due to that incorrect interpretation, the Defendant was not allowed to compare DNA evidence in his case to CODIS samples.  We disagree with the Estate that the erroneous conclusions in the Alley decisions relative to the Defendant's ability to compare DNA evidence with a third-party database so pervaded those decisions that a procedural due process violation occurred.  Though this court in the Alley decisions incorrectly ruled in that regard, the various courts to analyze the Defendant's petitions for DNA testing did not deny testing on that ground alone.  Rather, the courts denied post-conviction DNA testing because it was not reasonably probable that the results of testing would have affected the jury's verdict or the Defendant's sentence.

Multiple courts considered the Defendant's requests and, after performing a full analysis of his claims, concluded that he had not shown entitlement to DNA testing under the DNA Act.  Specifically, in 2004, the trial court denied the Defendant's petition for DNA testing, finding that the Defendant had "failed to demonstrate that a reasonable probability exist[ed] that . . . he would not have been prosecuted or convicted if exculpatory results had been obtained through DNA analysis of the requested samples."  Alley I, 2004 WL 1196095, at *1.  The trial court further found that the Defendant had "failed to demonstrate that a reasonable probability exist[ed] that analysis of said evidence w[ould have] produce[d] DNA results which would have rendered the [Defendant's] verdict or sentence more favorable if the results had been available at the proceeding leading to the judgment of conviction."  Id.

On appeal, this court affirmed.  After stating the purpose of the DNA Act was "not to create conjecture or speculation that the act may have possibly been perpetrated by a phantom defendant," we indicated that we would proceed to review the evidence in light of the possible results of DNA testing.  Alley I, 2004 WL 1196095, at *9.  This court then engaged in analysis of the eleven biological samples the Defendant desired to test and

- 30 -

detailed the trial evidence used to convict the Defendant. Id. at *10-12. Ultimately, this court determined that even if any of samples of which the Defendant sought testing revealed the presence of a third-party's DNA, the Defendant had still failed

> to establish that (1) a reasonable probability exist[ed] that the [Defendant] would not have been prosecuted or convicted if exculpatory results had been obtained through DNA analysis and (2) a reasonable probability exist[ed] that analysis of the evidence w[ould have] produce[d] DNA results which would have rendered the [Defendant's] verdict or sentence more favorable if the results had been available at the proceedings leading to the judgment of conviction.

Id. at *13 (citing Tenn. Code Ann. §§ 40-30-304(1), -305(1)).

In 2006, the trial court, ruling on the Defendant's second petition for DNA testing, again denied his request. The trial court determined that the Defendant had "failed to meet the statutory requirements which would mandate DNA Analysis as outlined in Tenn[essee] Code Ann[otated section] 40-3[0]-304 and ha[d] not convinced th[e] court that discretionary analysis should [have] be[en] granted under" Code section 40-30-305. Alley II, 2006 WL 1703820, at *4. Specifically, the trial court held,

> With regard to requirements of Tenn[essee] Code Ann[otated section] 40-3[0]-304, the court finds that [the Defendant] has failed to demonstrate that a reasonable probability exists that . . . he would not have been prosecuted or convicted if exculpatory results had been obtained through DNA analysis of the requested samples; [the Defendant] has failed to demonstrate that some of the samples sought are still in existence and/or are in a condition that is suitable for testing; and [the Defendant] has failed to demonstrate that the purpose of the petition is to determine actual innocence and not merely to delay the execution of his sentence. See Tenn. Code Ann. § 40-30-304(1), (2), and (4). Thus, testing is not mandated in this case.

> Additionally, this court finds that the [Defendant] has failed to demonstrate that a reasonable probability exists that analysis of said evidence will produce DNA results which would have rendered the [Defendant's] verdict or sentence more favorable if the results had been available at the proceeding leading to the judgment of conviction. See Tenn. Code Ann. § 40-30-305. Thus, this court is not inclined to order testing under the discretionary portion of the Act[.]

Id.

- 31 -

Again, this court affirmed on appeal. Despite this court's holding that the DNA Act did not create an interest in establishing the guilt of a speculative and unknown third party, the court again engaged in a thorough analysis of the evidence. After first determining that the record supported the trial court's conclusion that several items were no longer in existence for DNA testing or in a condition suitable for DNA testing, we proceeded with an analysis of the remaining items. Alley, 2006 WL 1703820, at *13. In analyzing these items, this court noted the trial court's findings that the Defendant had not established that biological specimens were present on many of the items of evidence for which he sought testing. Id. at *16-22. The court also found that there was an issue of contamination of certain physical evidence because it had been in the custody of the Shelby County Criminal Court Clerk's Office for twenty or more years. Id. at *17, *22-23. Regardless, this court agreed with the trial court that even if testing of these items did reveal the presence of a third-party's DNA, the Defendant had failed to establish, in light of the evidence of his guilt, that (1) a reasonable probability existed that the Defendant would not have been prosecuted or convicted if exculpatory results had been obtained through DNA analysis; and (2) a reasonable probability existed that analysis of the evidence would have produced DNA results which would have rendered the Defendant's verdict or sentence more favorable if the results had been available at the proceedings leading to the judgment of conviction. Id. at *15-24.

Twice, in reference to this court's decisions in Alley I and Alley II, the Tennessee Supreme Court and the United States Supreme Court considered his arguments for intervention and further review and twice declined to do so. That the Tennessee Supreme Court later overruled part of the reasoning of the Alley II decision in Powers does not entitle the Estate years afterward to relitigate the DNA claims under the pretense of due process.

Moreover, much of the post-judgment evidence the Estate asks us to consider—such as Dr. Leo's report regarding the Defendant's confession, tire tracks and shoe prints from the abduction scene not matching the Defendant's belongings, and a witness's description of the perpetrator varying from the Defendant's person—has already been discussed and rejected by this court in our prior opinions. Given the earlier findings by this court in its two prior opinions that the Defendant had failed to satisfy all of the criteria for DNA testing, any advancements in DNA analysis since that time do not entitle the Defendant, or the Estate on his behalf, another bite of the apple. Also, the Defendant never claimed at trial that he was actually innocent of the murder but instead raised an insanity defense. We agree with the State that the Defendant did not lack due process to adjudicate his claims.

The Estate argues that application of the three-pronged balancing test of Mathews— the private interest that will be affected by the official action; the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of

additional or substitute procedural safeguards; and the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail—requires that it be permitted to petition for DNA testing. See 424 U.S. at 335. However, in weighing the Mathews factors in the post-conviction context, our supreme court has explained that the private interest at stake is "a prisoner's opportunity to attack his conviction and incarceration on the grounds that he was deprived of a constitutional right during the conviction process." Whitehead, 402 S.W.3d at 623. The Government's interest is "the interest in preventing the litigation of stale and groundless claims," coupled with concerns about "the costs to the State of continually allowing prisoners to file usually fruitless post-conviction petitions." Id. (quoting Burford v. State, 845 S.W.2d 204, 207 (Tenn. 1992)). The remainder of the analysis focuses on "the risk of erroneous deprivation" of the prisoner's interest, and safeguards that may be necessary to protect that interest. Id.

Here, balancing the competing interests involved, we hold that the Defendant while alive was provided with the opportunity to raise his claims for DNA testing at a meaningful time and in a meaningful manner, his having multiple attempts to raise post-conviction DNA claims before his execution. See Stokes, 146 S.W.3d at 61 (quoting Mathews, 424 U.S. at 333). Accordingly, the Estate has failed to establish any procedural due process violation by the implementation of the DNA Act's procedures relative to the Defendant.

3. Other Deeply-Rooted Principles. The Estate contends that the State's opposition to DNA testing in this case offends two other deeply-rooted due process principles, those being, (1) "the Due Process Clause generally prohibits the government from skewing procedures in its own favor or feathering its own nest"; and (2) "[d]ue [p]rocess also prohibits the government from undertaking a course of action that offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental, or transgresses any recognized principle of fundamental fairness in operation." The Estate's argument regarding these other deeply-rooted due process principles focuses on the fact that the Defendant was executed and that the State, as the "wrongdoer," should not be allowed to benefit from his death by denying DNA testing to which the Defendant was entitled. The Estate submits the Defendant would be entitled to testing if he were alive based upon the Powers holding, testing which he sought while alive but was denied, and that to deny this testing because of the Defendant's execution "is conscious-shocking and inconsistent with basic notions of fairness."

State court rulings on issues of state law may rise to the level of due process violations if they "offend[] some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental." Seymour v. Walker, 224 F.3d 542, 552 (6th Cir. 2000) (quoting Montana v. Egelhoff, 518 U.S. 37, 43 (1996)). Such rulings must be "so egregious that [they] result in a denial of fundamental fairness." Bugh

v. Mitchell, 329 F.3d 496, 512 (6th Cir. 2003). Fundamental fairness under the Due Process Clause is compromised when the action complained of "violates those fundamental conceptions of justice which lie at the base of our civil and political institutions and which define the community's sense of fair play and decency." Dowling v. United States, 493 U.S. 342, 352 (1990) (citations and internal quotation marks omitted). Thus, courts "have defined the category of infractions that violate 'fundamental fairness' very narrowly." Id.

First, we observe that the Estate's argument in this regard is vague and conclusory. Moreover, the Estate's allegation that the Defendant would be entitled to testing if he were alive based upon the Powers holding is unsubstantiated and not supported by the previous decisions of this court. Again, the Defendant never argued his actual innocent at trial. Finally, because the Defendant had, and took advantage of, multiple opportunities, both state and federal, to challenge his convictions prior to his execution, we simply have no basis upon which to conclude the various courts' rulings violated fundamental conceptions of justice. See, e.g., Matthew Lusane v. Charmaine Bracy, Warden, No. 5:18-cv-0632, 2020 WL 8458807, at *17 (N.D. Ohio Feb. 27, 2020) (reaching a similar conclusion).

### B. Exoneration

The Estate argues that the Defendant had a property interest in exoneration and non-discretionary exoneration compensation, which passed to the Estate upon the Defendant's death. Code section 40-27-109(a) establishes the governor's authority to grant exoneration:

> After consideration of the facts, circumstances and any newly discovered evidence in a particular case, the governor may grant exoneration to any person whom the governor finds did not commit the crime for which the person was convicted. No person may apply for nor may the governor grant exoneration until the person has exhausted all possible state judicial remedies.

Tennessee regulations establish the procedure for seeking exoneration. Robert C. Butler v. Governor Bill Haslam, No. 3:19-cv-00416, 2019 WL 2327523, at *7-8 (M.D. Tenn. May 30, 2019).

Additionally, an exonerated person can seek compensation for the years of imprisonment served as the result of a wrongful conviction. The Tennessee Board of Claims is authorized to "hear claims for compensation by persons wrongfully imprisoned," but only if such persons have been "granted exoneration pursuant to [Code section] 40-27-109." Tenn. Code Ann. § 9-8-108(a)(7).

First, we note that this is a petition for DNA testing and not an application for exoneration pursuant to Tennessee Code Annotated section 40-27-109. The Estate seemingly claims that the Defendant had a right to exoneration; therefore, due process must provide the Estate on behalf of the Defendant with the means via the DNA Act to prove the actual innocence of the Defendant in pursuit of that exoneration.

In the sense in which the Estate is seeking the Defendant's "exoneration," it is no different than a posthumous claim of actual innocence. We, in the section above, have concluded that the Defendant received procedural due process relative to his petitions for DNA testing under the DNA Act. As for any potential exoneration claim, the Estate has not cited any process provided under the exoneration statute, Code section 40-27-109, or the corresponding regulations, guaranteeing either exoneration or a means by which the State must conduct an investigation in support of an application for exoneration. Just as with clemency, an issue addressed prior to the Defendant's death, there is no substantive due process right of access to evidence to present claims in executive clemency proceedings or otherwise, here, exoneration. See Alley, 431 F. Supp. 2d at 801-02; Alley, 2006 WL 1313364, at *2.

Importantly, "[n]o constitutional right to exoneration exists." Butler, 2019 WL 2327523, at *8; see also United States v. Quinones, 313 F.3d 49, 62 (2d Cir. 2002). Notably, the Supreme Court has expressly held that while the Due Process Clause protects against government infringement upon rights that are "so rooted in the traditions and conscience of our people as to be ranked as fundamental," there is no fundamental right to a continued opportunity for exoneration throughout the course of one's natural life. Herrera v. Collins, 506 U.S. 390, 407-08, 411 (Tenn. 1993). Moreover, the governor's decision whether to grant exoneration is purely discretionary. See Tenn. Code Ann. § 40-27-109(a). "[U]nder the procedure established by state statute and regulation, the governor owes no particular process to an individual who seeks exoneration." Butler, 2019 WL 2327523, at *8.

Because a live defendant has no right to exoneration, it is axiomatic that the Estate has no such right on the deceased Defendant's behalf. Moreover, neither the Defendant nor the Estate could have any claim for exoneration-based compensation until the Defendant is first exonerated. The Estate's argument's regarding exoneration do not entitle to relief.

*C. Reputation*

The Estate argues that the Defendant had a property interest in his reputation that was entitled to due process and that this right passed to his estate upon his death. As a free-standing claim, the Estate asserts "Tennessee Constitution's Reputational Guarantee Requires that the Estate be permitted to petition for DNA Testing" on the Defendant's

behalf. According to the Estate, "[t]he DNA Analysis Act, if interpreted to preclude the Estate from bringing this petition, would impose an unconstitutional limitation on a procedural right that is essential to protecting one's reputation." The Estate, relying on the decision in Powers, notes that the Defendant was wrongly denied the opportunity to petition for DNA testing and clear his name of a first-degree murder conviction and death sentence prior to his execution.

According to the Estate, pursuant to Tennessee Constitution article I, section 17, the Defendant had a reputation right that mandates the Estate be allowed to bring a petition for DNA testing. Article I, section 17 of the Tennessee Constitution, known as the Open Courts Clause, provides,

> That all courts shall be open; and every man, for an injury done him in his lands, goods, person or reputation, shall have remedy by due course of law, and right and justice administered without sale, denial, or delay. Suits may be brought against the State in such manner and in such courts as the Legislature may by law direct.

In making its argument, the Estate observes that "[t]he framers of the Tennessee Constitution were heavily influenced by the Pennsylvania Constitution, and like many other provisions of the Tennessee Constitution, this provision has its origins in the Pennsylvania Constitution, which contains the same language." See generally State ex rel. Haynes v. Daugherty, No. M2018-01394-COA-R10-CV, 2019 WL 4277604, at *6 (Tenn. Ct. App. Sept. 10, 2019) (detailing Pennsylvania's influence on the Tennessee Constitution). The Pennsylvania Constitution expressly provides for the right to access the courts in article I, section 11:

> All courts shall be open; and every man for an injury done him in his lands, goods, person or reputation shall have remedy by due course of law, and right and justice administered without sale, denial or delay. Suits may be brought against the Commonwealth in such manner, in such courts and in such cases as the Legislature may by law direct.

Relying on Pennsylvania jurisprudence interpreting this similar provision, the Estate submits that the Defendant had "a fundamental enumerated constitutional right" in his reputation that was entitled to due process of law.

Initially, we note that the Pennsylvania Constitution has an additional provision that is not present in the Tennessee Constitution, a provision that enumerates certain rights, including one's reputation. Specifically, article I, section 1 of the Pennsylvania Constitution, commonly referred to as the Declaration of Rights, states, "All men are born equally free and independent, and have certain inherent and indefeasible rights, among

- 36 -

which are those of enjoying and defending life and liberty, of acquiring, possessing and protecting property and reputation, and of pursuing their own happiness."  The Pennsylvania Supreme Court has relied on both provisions of the Pennsylvania Constitution, article I, sections 1 and 11, as establishing reputation as a fundamental right that could not be abridged without compliance with state constitutional standards of due process and equal protection.  See In re J.B., 107 A.3d 1, 16 (Pa. 2014) (recognizing that "the right to reputation, although absent from the federal constitution, is a fundamental right under the Pennsylvania Constitution" and citing both article I, sections 1 and 11)); Wolfe v. Beal, 384 A.2d 1187, 1189 (Pa. 1978) (citing only article I, section 1); Moyer v. Phillips, 341 A.2d 441, 443 (Pa. 1975) (citing both provisions, though specifically noting that "[t]he courts recognized that the Pennsylvania Declaration of Rights placed reputation 'in the same class with life, liberty and property'").  No such corresponding provision like Pennsylvania's Declaration of Rights exists in the Tennessee Constitution.

In addition, "[t]he guarantee of due process, in Pennsylvania jurisprudence, emanates from a number of provisions of the Declaration of Rights, particularly [a]rticle I, [s]ections 1, 9, and 11 of the Pennsylvania Constitution."  Khan v. State Bd. of Auctioneer Examiners, 842 A.2d 936 (Pa. 2004) (citing Lyness v. State Bd. of Medicine, 605 A.2d 1204, 1207 (Pa. 1992)).  To the contrary, Tennessee has a specific due process provision in article I, section 8 and does not enumerate a right to reputation in that section.  As noted above, Tennessee's due process clause as been held to be "synonymous" with the United States Constitution, and one's reputation is not a right, privilege or immunity protected by the United States Constitution.  See Paul v. Davis, 424 U.S. 693, 711-13 (1976) (concluding that "stigma" to reputation, by itself, is not a liberty interest sufficient to invoke the Due Process Clause of the United States Constitution).  The Estate has cited to ample caselaw from Pennsylvania establishing reputation as a fundamental right, but not to a single case from Tennessee holding the same; we also cannot find one.

Regardless, based on the language of article I, sections 1 and 11 of the Pennsylvania Constitution, the Pennsylvania Supreme Court has also stated, "The redress provided [for injury to one's reputation] under our body of substantive law is an action in tort for defamation."  Sprague v. Walter, 543 A.2d 1078, 1084 (Pa. 1988).  Thus, the Pennsylvania courts would not even take the reputational right to the extremes requested by the Estate, that being, in a criminal case, creating the means via the DNA Act to investigate based solely upon a potential injury to one's reputation.

Finally, any theoretical right to redress harm to the Defendant's reputation was extinguished with his death.  Even in Pennsylvania, the right does not survive death. Moyer, 341 A.2d at 443 (citing Anderson v. G.A.C. Consumer Disc. Co., 53 Pa. D. & C.2d 464 (C.P. Lack. 1971); Smith v. Brown, 17 Pa. D. & C. 548 (C.P. Monroe 1933)).  The

Estate has no independent reputation.  Accordingly, neither due process nor any stand-alone reputational right entitle the Estate to the relief it seeks.

<u>CONCLUSION</u>

In accordance with the foregoing, we affirm the post-conviction court's dismissal of the Estate's petition for DNA testing.

_____
D. KELLY THOMAS, JR., JUDGE